UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ALEXANDER D. TURNPAUGH,

    Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 3:25-CV-2 JD

**OPINION ORDER**

    Plaintiff Alexander Turnpaugh applied for supplemental security income under Title XVI of the Social Security Act, alleging that he became disabled in March 2022, when he was 18 years old. His claim was rejected, leading to a review by an Administrative Law Judge ("ALJ"), who concluded that Mr. Turnpaugh was not disabled. The Appeals Council later denied his request for review, and Mr. Turnpaugh now seeks judicial review in this Court. For the reasons below, the Court will remand the case to the Social Security Administration for further proceedings.

**A. Standard of Review**

    Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The

threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Still the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant and the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**B. Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). The claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs

in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

### C. The ALJ's Decision

In finding that Mr. Turnpaugh was not disabled, the ALJ employed the customary five-step analysis. At step two, she found that Mr. Turnpaugh suffered from the following severe impairments: "celiac disease, pervasive development disorder, autism, anxiety, and attention deficit hyperactivity disorder (ADHD)." (ALJ's Decision, R. at 12.) At step three, the ALJ concluded that Mr. Turnpaugh "does not have an impairment or combination of impairments that meets or medically equals the severity of [a Listing]" (*id*. at 13), and that the "paragraph C" criteria are not satisfied to establish a serious and persistent mental disorder (*id.* at 14).

In determining Mr. Turnpaugh's residual functional capacity ("RFC"),[1] the ALJ recognized that Mr. Turnpaugh's medical conditions could reasonably account for the symptoms he described. Even so, she concluded that Mr. Turnpaugh's statements regarding the severity, persistence, and limiting effects of those symptoms were not fully consistent with the medical and other evidence in the record. (R. at 15.) For example, as relevant here, the ALJ noted that his medication worked well:

> He seemed to do well with his medications and rated his depression and anxiety 0–2/10. His medication also helped him stay focused, complete tasks, make good grades, and sleep well. In May 2022, he started weaning off Lamictal and continued to do well (Exhibit 8F). In July 2022, his nurse added hydroxyzine for anxiety. In November 2022, he reported some issues with focus as his pharmacy had been out of Adhansia for five weeks (Exhibit 9F). In January 2023 and March 2023, he rated his depression 0/10 and anxiety 1/10. He also said Vyvanse helped him focus. He

---

[1] "The RFC reflects 'the most [a person] can still do despite [the] limitations' caused by medically determinable impairments and is assessed 'based on all the relevant evidence in [the] case record.'" *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) (quoting 20 C.F.R. §§ 404.1545, 416.945(a)).

4

> was living alone and enjoying it. In May 2023, he had mild anxiety that might impact attention on occasion, cause fleeting restlessness, and minimally interfered with daily life. In August 2023, he had some struggles with daily activities, showering, changing clothes, doing class work, and caring for his cat (Exhibit 16F). In October 2023, he reported increased anxiety and issues with focus since not having ADHD medication, so his nurse prescribed Adderall. A month later, he was not getting enough sleep but not taking trazodone. He also had not been keeping up with housework and had not been taking Adderall as scheduled (Exhibit 19F).

(ALJ's Decision, R. at 16.)

The ALJ also observed that he lives alone, has a driver's license, drives himself to work, is able to shop by himself, is able to do chores, and was successful at an internship. (*Id*., R. at 17.) The ALJ also noted that his work at Kroger, although not a disqualifying substantial gainful activity, shows that his daily activities had been "somewhat greater than he has generally reported" and, although he was let go, "his records show he was terminated due to behavior issues such as being on his phone, texting on his watch, and not working while outside." (*Id*.) Moreover, "despite his complaints of difficulty with self-care and hygiene, his exams routinely describe him as well dressed and groomed." (*Id*.) In reviewing Mr. Turnpaugh's behavior consultant's reports, the ALJ noted that he was "extremely comfortable in his home as his mother helped him fix it up and his grandmother paid his bills" which "resulted in difficulties with motivation to make changes." (*Id.*, R. at 16.) He worked toward an IT certification, passing the first part of the test. His parents gained guardianship of him to assist with managing finances, but he continued to work on time management, self-care, and hygiene skills. (*Id.*) For all these reasons, the ALJ "generally [found] [Mr. Turnpaugh's] description of the location, duration, frequency, and intensity of his symptoms unpersuasive . . . ." (*Id*., R. at 17)

The ALJ concluded that Mr. Turnpaugh has the RFC to perform

> a full range of work at all exertional levels but with the following nonexertional limitations: able to perform simple, routine, and repetitive tasks but not at a production rate pace; able to make simple work related decisions; occasionally

> tolerate few changes in a routine work setting; able to interact with supervisors frequently; able to interact with coworkers occasionally but never working in tandem or in group settings with coworkers; and no transactional interaction with the public.

(*Id.*, R at 14.)

The ALJ posed a hypothetical question to the vocational expert ("VE") based on his RFC findings. The VE testified that there are jobs in the national economy in significant numbers that a hypothetical person with Mr. Turnpaugh's RFC could perform: cleaner, hand packager, laundry worker, inspector hand packager, garment sorter, and laundry sorter. (*Id*. R. at 18–19.) Relying on the VE's testimony, the ALJ concluded "that, considering [Mr. Turnpaugh's] age, education, work experience, and residual functional capacity, [Mr. Turnpaugh] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id*., R. at 19.)

## C.  Discussion

In his appeal, Mr. Turnpaugh argues that the ALJ erred in his subjective symptom analysis. In particular, he contends that the ALJ failed to consider the entire case record as required by SSR 16-3p, including statements from his Behavioral Consultant, Angie Bostic. According to Mr. Turnpaugh, those statements contradict the ALJ's findings about his ability to live and work independently. Mr. Turnpaugh asserts that the ALJ cherry-picked evidence, ignoring significant limitations in his daily living activities and his significant reliance on his mother for assistance. He also argues that the ALJ erroneously relied on his brief, part-time job at Kroger to conclude that he is able to work full-time. Mr. Turnpaugh thus claims that the ALJ's decision is unsupported by substantial evidence and fails to build an accurate and logical bridge between the evidence and the result.

\* \* \* \* \*

Once an ALJ finds that a claimant has a medically determinable impairment that "could reasonably be expected to produce" the claimant's symptoms, the ALJ "must then evaluate the intensity and persistence" of those symptoms to determine how they limit the claimant's "capacity for work." 20 C.F.R. § 416.929(c)(1). "If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, [an ALJ] will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . ." Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims (Oct. 25, 2017). On the other hand, if the alleged symptom severity is inconsistent with the objective medical evidence and the other evidence of record, the ALJ "will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . ." *Id*. Consistent with 20 C.F.R. § 416.929(c)(1)-(4), an ALJ must consider objective medical evidence as well as factors relating to the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; any measures the claimant uses or has used to relieve pain or other symptoms; and other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Id*; *see also* SSR 16-3P, 2017 WL 5180304, at \*8.

An ALJ's subjective symptom analysis is given special deference so long as the ALJ explains his reasoning and it is supported by the record. The Court "will uphold an ALJ's credibility determination unless that determination is 'patently wrong.'" *Wilder v. Kijakazi*, 22

F.4th 644, 653 (7th Cir. 2022) (quoting *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (quoting *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012))). The claimant bears the burden of demonstrating that an ALJ's subjective symptom evaluation is patently wrong. *See Horr v. Berryhill*, 743 F. App'x 16, 19–20 (7th Cir. 2018).

> Social Security Ruling 16-3p explains factors to consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms. 2017 WL 5180304 (Oct. 25, 2017); *see also* 20 C.F.R. § 404.1529. Notably, ALJs "will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p, 2017 WL 5180304 at *11. Instead, ALJs should "focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and . . . whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id*.

*Wilder*, 22 F.4th at 653–54.

Even though the review is highly deferential, [w]hen an ALJ rejects a claimant's testimony as not credible, they must articulate the reasons for that finding. Failure to do so can result in reversal." *Thorlton v. King*, 127 F.4th 1078, 1082 (7th Cir. 2025). Of course, an ALJ may not cherry-pick evidence supporting a finding of non-disability while ignoring evidence that points to the contrary. *Reinaas v. Saul*, 953 F.3d 461, 466 (7th Cir. 2020) ("An ALJ cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding"). An ALJ need not address every piece of evidence in the record, *see Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009), but she may not ignore an entire line of evidence contrary to her ruling. *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016).

\* \* \* \* \*

Although Mr. Turnpaugh faces a high burden to show error in the ALJ's subjective symptom analysis, he has met that burden because the ALJ's evaluation is patently wrong. Mr.

Turnpaugh "allege[d] disability due to problems with distraction, keeping up with daily activities, interacting with people, and other effects of celiac disease, pervasive development disorder, autism, anxiety, and ADHD." (ALJ's Decision, R. at 15.) The ALJ found that his statements about the intensity, persistence, and limiting effects of his symptoms are not supported by objective medical evidence or other evidence. (*Id*.) The Commissioner's brief is largely dedicated to showing that the ALJ properly evaluated the objective medical evidence, but the ALJ must consider both objective medical evidence and the other evidence of record, consistent with 20 C.F.R. § 416.929(c)(2)–(3). *See id*. (listing factors relevant to evaluation of symptoms, including daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medications; other treatment received; measures used to relieve symptoms; and other factors concerning functional limitations). Although the ALJ purported to analyze this other evidence, her treatment of Mr. Turnpaugh's daily activities mischaracterizes the record, so her findings aren't based on substantial evidence.

The ALJ found that, although Mr. Turnpaugh claimed that he was capable of only "fairly limited daily activities[,] . . . at certain points in the record, he admits to more abilities than he alleges." (ALJ's Decision, R. at 17.) The ALJ does not specify which of Mr. Turnpaugh's activities she is considering, but to support this finding she indicates that "[Mr. Turnpaugh] lives alone, has a driver's license, drives himself to work, is able to shop alone and pay for his items, is able to do chores, and was successful in an internship." (*Id.* R. at 17.) Missing from this list, however, is the context of how these activities are carried out, that is, whether they align with the abilities that the ALJ attributes to Mr. Turnpaugh. *See Richardson v. Astrue*, No. 1:08-CV-142, 2009 WL 799543, at *5 (S.D. Ind. Mar. 23, 2009) ("The Seventh Circuit has 'cautioned the

Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home,' and ignoring how a claimant carried out such activities." (quoting *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008)). Consider that Mr. Turnpaugh's behavior consultant, Angie Bostic, reported multiple difficulties that Mr. Turnpaugh encounters daily. According to Ms. Bostic, among other things, Mr. Turnpaugh "struggles to build healthy relationships with others given some communication barriers as well as a continual need to be taught appropriate social skills." (R. at 900.) "Repetition as well as continued education are needed in most areas of his life." (*Id*.) "In regard to self-care habits and personal hygiene, he often has to be prompted to take a shower and to maintain care of his body. If left to manage his self-care on his own, it would not be unlikely for Alex to go a week or longer without any kind of self-care habits." (*Id*.) He "struggles at times to complete tasks that are essential for him to live independently." (*Id*.) "His ability to manage his finances is extremely poor at present given that he has limited concepts of how to manage it." (*Id*.) "He struggles with motivation and his ability to retain attention to complete tasks and often struggles to find a purpose or goals for him to reach on a daily basis. As long as things are very concrete for [Mr. Turnpaugh] and laid out for him, he can follow those instructions and the result can be beneficial for him." (*Id*.) "Given that [Mr. Turnpaugh] can become easily overwhelmed with tasks, particularly those tasks that he does not feel are important, but that truly are necessary, results in him needing additional supports." (*Id*.) "It is this behavior consultant's recommendation that he continue to receive behavior management services, as he continues to acclimate to his semi-independent living situation." (*Id*.)

Although the ALJ acknowledged and discounted elsewhere in the decision Mr. Turnpaugh's allegations of serious hygiene issues (*see* ALJ's Decision, R. at 16 ("In August

2023, he had some struggles with daily activities, showering, changing clothes, doing class work, and caring for his cat."); R. at 17 ("Despite his complaints of difficulty with self-care and hygiene, his exams routinely describe him as well dressed and groomed.")), and recognized his difficulty managing finances (*see id.*, R. at 16 ("He also struggled with managing his finances.")), she failed to consider the full extent of the day-to-day challenges that Ms. Bostic documented. Without some explanation of how the RFC limitations accommodate these challenges—such as Mr. Turnpaugh's need for repetitive and continual instruction, his difficulty completing tasks essential for independent living, his problems with motivation and sustaining attention, and his tendency to become easily overwhelmed— the Court cannot trace the path of the ALJ's reasoning.

What's more, the ALJ is at odds with her own observation that Mr. Turnpaugh's rehab records reflect that he is "able to complete *simple* household chores" (*id.*, R. at 15–16 (emphasis added)) and is "able to stay home alone for *short* periods" (*id.* R. at 16 (emphasis added)). This is a far cry from implying, without an explanation, that Mr. Turnpaugh can do a full range of chores or suggesting that he lives independently. In any case, the ALJ did not explain why doing household chores would contradict Mr. Turnpaugh's reported mental struggles. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (explaining that the ALJ's unsupported, vague, or incomplete findings cannot be used to discredit the claimant's reported limitations).

In fact, although Mr. Turnpaugh testified that he lives alone, he said that his mother visits him six times per week. (R. at 39.) He said that he struggles with household chores and relies on his mother for help, particularly with cleaning and organizing. (R. at 41.) Nor can he shop by himself because he does not look at the prices and can't figure out what food is good for him. (R. at 44.) He told the ALJ that he has no in-person friends but has one or two friends online. (R. at

11

40.) He has had difficulty forming friendships at work. (*Id*.) Mr. Turnpaugh described his daily routine as waking up at 9:30 a.m., taking medication, playing video games for most of the day (about 12 hours), and feeding his cat. (R. at 41, 50.) He stays up until 2 or 3 a.m. (R. at 46.) The ALJ did not grapple with these allegations, which tend to contradict her findings that Mr. Turnpaugh is essentially not limited in his daily activities.

Also, although the ALJ considered Mr. Turnpaugh's thirty days at Kroger as indicating that his "daily activities have, at least at times, been somewhat greater than he has generally reported" (ALJ's Decision, R. at 17), she ignored Mr. Turnpaugh's testimony that he struggled with the speed of bagging because of difficulty separating bags and keeping up with the cashier's pace. He also had difficulty pushing the required number of carts because of limited strength, managing only three at a time.[2] (R. at 37–38.) While the ALJ need not believe Mr. Turnpaugh, or anyone else for that matter, she must confront evidence that contradicts her findings and explain the basis for her conclusion. She cannot cherry-pick evidence favorable to her ultimate conclusion. "[T]he ALJ should explain any purported inconsistencies between the claimant's daily activities, subjective complaints, and the medical evidence in the record. A rote listing of activities does not cut it." *Clark v. Saul*, 421 F. Supp. 3d 628, 632 (N.D. Ind. 2019) (citing *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) and *Nelson v. Colvin*, 2016 WL 337143, at *6 (N.D. Ill. Jan. 27, 2016) ("The mere listing of daily activities does not establish that a claimant does not suffer disabling pain and is capable of engaging in substantial gainful employment.").

---

[2] In his opening brief, Mr. Turnpaugh characterizes his work at Kroger as "sheltered employment." (Pl. Br., DE 9 at 18–19.) Although Mr. Turnpaugh provides no reason for this classification, he argues that "[t]he ALJ's reliance on Alexander's 30-day part-time sheltered employment is . . . ill-placed." (*Id*. at 18.) The Commissioner does not respond to this argument or any argument concerning Mr. Turnpaugh's employment at the grocery store. Such silence constitutes a waiver. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

In his response, the Commissioner engages with the ALJ's treatment of the objective evidence but addresses the subjective-symptom analysis only superficially. Without much of a discussion, the Commissioner only states summarily that "[t]he ALJ provided valid bases, grounded in the record, for discounting Mr. Turnpaugh's reports of disabling symptoms" (Def.s Resp. Br., DE 13 at 7), and "[i]t was the ALJ's duty to weigh the conflicting evidence and determine his RFC." Missing from the Commissioner's brief is any explanation of how the ALJ's failure to consider an entire line of evidence contrary to her ruling can be reconciled with Seventh Circuit law.

The Court recognizes the considerable burden that ALJs shoulder daily. Further, the Court recognizes that their decisions are entitled to the benefit of harmless error analysis when evaluating medical opinions. *McKinsey v. Astrue*, 641 F.3d 884, 891–92 (7th Cir. 2011) (finding harmless error when the ALJ failed to assign weight to a state agency physician's opinion); *Jason M. v. Kijakazi*, 2022 WL 2071096, *5–*6 (S.D. Ind. June 9, 2022) (applying harmless error analysis to an alleged failure to consider a medical opinion). An error is harmless if, upon examination of the record, the reviewing Court can "predict with great confidence what the result of the remand will be." *Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022). Yet the Court cannot reach such a conclusion here because of ambiguities in how the ALJ considered the allegations of activities of daily living.

On remand, the ALJ should re-evaluate Mr. Turnpaugh's subjective symptoms and properly analyze the intensity and limiting effects of those symptoms, including his alleged ability to live only semi-independently, his dependence on his mother and the guidance of his behavior consultant, and his difficulties in forming and maintaining relationships, and assess how they affect his ability to maintain full-time employment.

### E. Conclusion

For these reasons, the Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: December 11, 2025

                /s/ JON E. DEGUILIO
                Judge
                United States District Court